**In re P. Joseph NICOLA, Debtor.**

**No. 99–18658 SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 26, 2001.

Steven B. Mirow, Philadelphia, PA, for debtor.

Frederick L. Reigle, Reading, PA, Chapter 13 Trustee.

Edmond M. George, Obermayer, Rebmann Maxwell & Hippel, Philadelphia, PA, for movant.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

This Chapter 13 Bankruptcy case was dismissed with prejudice by Order dated July 19, 2000. Remaining before the Court, however, is creditor David Piscitelli's Motion for Sanctions under F.R.B.P. 9011. The Motion is directed against both the Debtor, P. Joseph Nicola, as well as his counsel Steven B. Mirow, Esquire. Each Respondent has filed a written response and a hearing was held on October 2, 2000. As will be discussed herein, the Court finds the imposition of monetary sanctions to be warranted in this instance, not only for violations of F.R.B.P. 9011, but also on the basis of the Court's inherent power to issue sanctions in order to deter abuse of the judicial process.

The history of this case is difficult to synopsize. The explanation for this goes in part to the merits of the present sanctions motion; which is to say that the manner in which this ill fated case lurched forward is partially a product of the Respondents having knowingly filed certain false papers with the Court, and also a product of the Respondents' intermittent disregard for court dates, rules of procedure, and various commitments to provide documentary information to the Chapter 13 Trustee and other interested parties.

With this qualification stated, the relevant facts are as follows:

This bankruptcy case was commenced on July 8, 1999. On that date there was pending in the Atlantic County Division of the Superior Court of New Jersey a lawsuit in which the Debtor, various members of his family, and an entity known as the "Temple of Knowledge, Inc.," were named as defendants. Broadly speaking, the plaintiff in that lawsuit, David Piscitelli, alleged a conspiracy by and among the defendants which succeeding in defrauding him of approximately $600,000. Trial of the proceeding was imminent and was anticipated to take at least three weeks. The Debtor at this time was an attorney operating a solo practice and specializing mainly in personal injury litigation. In later proceedings in this Court, the Debtor testified that he feared that the conduct of the lengthy trial would so seriously interfere with his law practice as to cause it to fail. He testified that he consequently consulted bankruptcy counsel and was advised that a Chapter 13 filing would be a proper course for him to pursue. The Debtor contends that he acted on this advice in commencing his bankruptcy case, retaining his friend, Steven Mirow, Esquire for that purpose.

The Debtor's original bankruptcy schedules and statement of financial affairs were filed on July 24, 1999. As assets, the Debtor listed 1) a single family residence in Havertown, Pennsylvania, having a value of $160,000, and total mortgage indebtedness of $148,300; 2) a 10% tenancy in common interest with his sister in a condominium unit in Philadelphia (value $9,000), 3) cash of $1,550, 4) household goods of $2,900, and 5) office equipment of $1,700. Other than his mortgagee, the Debtor scheduled only two liabilities: a $16,000 debt to the attorney representing him in the above described New Jersey state court litigation, and a $600,000 debt to the state court plaintiff Piscitelli. The Debtor listed monthly income from his law practice of $3,800 and monthly expenses of $3,648. His Chapter 13 plan (previously filed on July 8, 1999) called for payment to unsecured creditors of $75.00 per month for three years. A first meeting of creditors pursuant to 11 U.S.C. § 341 was held on August 27, 1999, but was continued generally pending the filing of amended schedules.

On September 29, 1999, Piscitelli sought relief from the automatic stay in order to resume litigation in New Jersey. An answer in opposition to that motion was filed and a hearing was held on September 29, 1999. At this hearing, both the Debtor and his counsel acknowledged that the bankruptcy case had been commenced for the express purpose of stopping the Piscitelli litigation in New Jersey and, but for Piscitelli and the Debtor's state court attorney, the Debtor had few other creditors and no delinquent bills. This bankruptcy case, in other words, has at all relevant times and for all practical purposes been a two party dispute. When questioned by the Court as to a strategy beyond simply staying the Piscitelli litigation, counsel for the Debtor merely offered that he hoped that he would be able to settle the case with Piscitelli. (Transcript September 29, 1999 n.t. at Page 17) The Court advised the Debtor and his counsel at that time that such a vague and indefinite plan would hardly suffice. The Court nevertheless denied Piscitelli's relief motion that day, rescheduling it for re-hearing on October 27, 1999, and directing the Debtor and his counsel to determine in the interim how specifically they intended to address the Piscitelli claim.

At the continued hearing of October 27, 1999, neither the Debtor nor his counsel appeared. An Order granting relief from the automatic stay was thereupon entered. On November 8, 1999, the Debtor asked for reconsideration of this Order contending that his counsel has planned to appear at the October 27, 1999 hearing, but had inadvertently failed to appear because of a "computer/calendar" crash. The Debtor's reconsideration request was opposed by

Piscitelli and a hearing was held on December 15, 1999. At this hearing, it was brought out that for some reason the State Court in Atlantic County has dismissed Piscitelli's lawsuit in its entirety upon learning of the Nicola bankruptcy filing. Giving the Debtor and his counsel the benefit of the doubt as to the missed court date, the Court reinstated the automatic stay, but gave Piscitelli limited relief to reinstate the state court action and restore the status quo. Having also been belatedly advised by the Debtor that, in response to the Court's earlier direction, the Debtor planned to remove the Piscitelli litigation to the Bankruptcy Court, the Court gave the Debtor ten days following reinstatement of the Piscitelli action to do so. The New Jersey State Court litigation was ultimately reinstated by Piscitelli, although it cannot be determined from the record when this occurred. What the file does reflect is that on or about February 7, 2000, the Debtor, acting *pro se*, filed a notice of removal of the Piscitelli case to the United States District Court in New Jersey—Camden Vicinage. Piscitelli later moved to have the case remanded to State Court, however that motion was not acted upon by the District Court prior to the eventual dismissal of the Debtor's bankruptcy case in July 2000.

Meanwhile, on October 5, 1999, the Debtor had filed amended bankruptcy schedules. These reflected an increase in the Debtor's reported assets of over $100,000. There were several individual changes. The Debtor now reported that the tenancy in common interest with his sister in the Philadelphia condominium was a 33% interest worth $30,000. His petition date cash assets had risen by over $3,000. He also scheduled three significant previously unreported assets; being a $50,000 annuity fund, a $6,874 interest in a retirement plan, and $22,735 automobile alleged to be in the possession of Piscitelli. The Debtor claimed all of his assets, save for the condominium interest, as exempt.

The first meeting of creditors was reconvened on March 17, 2000. The Debtor's testimony at this hearing, however, revealed that there were still various omissions and inaccuracies on his bankruptcy schedules. A further set of amended schedules was requested by the Trustee and promised by the Debtor, but no other amendments were ever filed.

On the basis of the Debtor's original bankruptcy schedules, Piscitelli had filed both an objection to the Debtor's exemptions and an objection to confirmation of the Debtor's Chapter 13 Plan. On the basis of a $600,000 Proof of Claim filed by Piscitelli on November 12, 1999, the Trustee had filed a dismissal motion under 11 U.S.C. § 109(e). (Debt limitations) Following the filing of the Debtor's amended schedules, the Trustee also filed a separate objection to the Debtor's exemption claim.

The Trustee's dismissal motion was continued 7 times until on June 21, 2000, Piscitelli filed his own dismissal motion. No response to the Piscitelli motion was filed on behalf of the Debtor (despite his counsel's request for an extension of the time within which to respond), but both the Debtor and counsel were present at a hearing on the Piscitelli motion held July 14, 2000. At this hearing, the Court, together with the parties and the Chapter 13 Trustee, reviewed what the Court described at that time as a withering litany of failings present in the case. To recapitulate, these included the misstatement of scheduled assets and liabilities, the non scheduling of significant assets, the failure to file fully corrected schedules, the failure to file operating reports required of business debtors by the Chapter 13 Trustee, the repeated failure to provide the Trustee or Piscitelli with documentation to substantiate representations made at the creditors meetings, and the failure to file timely responses in contested matters and/or appear at scheduled court dates. As to these, the Debtor's counsel offered in response a somewhat rambling verbal statement in which he acknowledged cer-

tain of the foregoing failings, attempted to explain away others, and offered to correct still outstanding problems. In view of what it considered to be a woefully inaccurate response, the Court entered an Order on July 19, 2000 dismissing the Debtor's case with prejudice.

On July 31, 2000 the Debtor filed a motion seeking an extension of the time within which to seek reconsideration of the dismissal order, which request was denied, as moot, on August 16, 2000, after the Debtor had failed to file the underlying reconsideration motion within the relaxed timetable he had sought. Piscitelli, meanwhile, had filed the present motion for sanctions on August 4, 2000. The motion was originally scheduled for hearing on September 7, 2000, with written responses due on September 1, 2000. No timely responses were filed, however the hearing was continued until September 14, 2000. On September 13, 2000, Mirow filed a written answer to the sanctions motion and a separate written request to adjourn the hearing scheduled for September 14, 2000. In the latter pleading, counsel maintained that he had been led to believe by Piscitelli's attorneys that if the Debtor abandoned his request to seek reconsideration of the Dismissal Order of July 19, 2000, no sanctions would be pursued by Piscitelli. Counsel went on to recite that when the sanctions motion was received by him, he mistakenly took it as relating to the Debtor's Reconsideration Motion and therefore did not read it and then misplaced it. He requested both a thirty day adjournment of the sanctions motion hearing and an opportunity to supplement his separate written response to the sanctions motion. The hearing of September 14, 2000 was continued to October 2, 2000. On September 29, 2000 counsel filed a "Supplemental Answer" to the sanctions motion. The Debtor, for his part, had filed his own separate answer to the sanctions motion on September 22, 2000. The sanctions motion hearing, as noted above, went forward on October 2, 2000. The evidentiary record made at that time, consisted of certain documentary evidence introduced by the Movant, Piscitelli (Exhibit M–1 through M–8) and brief testimony adduced from the Debtor. Against this rather dispiriting backdrop, the Court now turns its attention to an analysis of the merits of Piscitelli's request for sanctions.

■ The present motion is based on F.R.B.P. 9011 which provides, in part:

**(a) Signature**

Every petition, pleading, written motion, and other paper, except a list, schedule, or statement or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name. A party who is not represented by an attorney shall sign all papers. Each paper shall state the signer's address and telephone number, if any. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

**(b) Representations to the Court**

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are like-

ly to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a local of information or belief.

**(c) Sanctions**

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.[1]

The Third Circuit Court of Appeals has held that Federal Rule of Civil Procedure 11 applies to Rule 9011. See *Landon v. Hunt*, 977 F.2d 829 (3d Cir.1992); *Cinema Service Corp. v. Edbee Corp.*, 774 F.2d 584, 586 (3d Cir.1985).

The primary purpose of Rule 9011 is to deter unnecessary filing with the court for the benefit of the judicial process. *In re Alberto*, 119 B.R. 985, 992 (Bankr. N.D.Ill.1990). It accomplishes this end by requiring an attorney to sign every petition, pleading, written motion and other paper (unless specifically excepted from the rule) and then providing that "by presenting to the court (whether by signing, filing, submitting, or later advocating)" the signed document, the attorney is certifying to the court that to the best of his or her knowledge, formed after reasonable inquiry, the document is not being presented to the court for an improper purpose.

Federal courts, including bankruptcy courts, also have the inherent power to impose sanctions on those who ap-

pear before them to deter abuses of the judicial process. See *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Incorporated*, 57 F.3d 1215, 1224 (3d Cir.1995) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). *See, also McGahren v. First Citizens Bank & Trust Company (In re Weiss)*, 111 F.3d 1159, 1171 (4th Cir.1997) (inherent power to sanction may be used [to] regulate litigants' behavior). Sanctions may be imposed when a party or its counsel acts in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc., supra*, at 45–46, 111 S.Ct. 2123. A court must make a specific finding of bad faith in order to impose sanctions under its inherent power. *Fellheimer, Eichen & Braverman, P.C., supra*, at 1227. The bad faith requirement sets a high threshold. *Matta v. May*, 118 F.3d 410, 416 (5th Cir.1997); *Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997). Under the rubric of its inherent powers, a Court may sanction clients, individual attorneys (regardless of whether they signed an objectionable document) and law firms. See *Fellheimer, Eichen & Braverman, supra*, at 1228 & n. 9.

There is little room to doubt that sanctions are appropriate in this case under the above guidelines. In reaching this conclusion, however, it is necessary to view the atrocious history of this case in its entirety and with retrospection. Only in this way can the true picture be appreciated. For example, one might argue, as do the Respondents, that the commencement of a bankruptcy case for the purpose of staying litigation is, in and of itself, not an act of bad faith. This proposition is not without some merit, as the creation of some "breathing space" through *inter alia*, an automatic stay is part of the philosoph-

---

1. In his moving papers, Piscitelli cites the Court to a long obsolete version of F.R.B.P. 9011, pursuant to which the imposition of sanctions upon the finding of a violation was made mandatory. The 1993 amendments to Federal Rule of Civil Procedure No. 11 re-

versed this practice and made the imposition of sanctions a discretionary matter. The Federal Rules of Bankruptcy Procedure were amended effective December 1, 1997 to conform to revised Rule 11.

ical undergirding of the Bankruptcy Code. Similarly, bankruptcy filings on the eve of a threatening event (here the Piscitelli trial) are common, and frequently such last minute filings do not permit a debtor to provide at the outset of a case all of the information which ultimately must be furnished. Thus, there is nothing immediately sinister, as the Respondents suggest, at the need for and the filing of amended bankruptcy schedules. Likewise, it is axiomatic that to err is human. The Respondents therefore are not automatically to be condemned for their inattentiveness in missing various court dates and other deadlines. The totality of the circumstances in a case such as this, however, must always be considered, and as with any large picture distance lends perspective. Review of the present case history leads ineluctably to the conclusion that the Respondents have violated both Rule 11 and are otherwise deserving of sanctions.

In this respect, the Court stresses the candid acknowledgments of both the Debtor and his counsel that the sole purpose of this bankruptcy case was to stop the Piscitelli litigation in New Jersey. Since this fact was plain from the very inception of the case, it resulted in an early admonition from the Court. There was never a question of whether the Debtor would have to confront Piscitelli's claims, only a question of when and where. There were no other dynamics in this case, save for the Piscitelli litigation, and it was incumbent on the Respondents to address that reality and to do so promptly. The Respondents, however, took a decidedly different tack. They did literally nothing of an affirmative nature to prosecute this case and consistently resisted the efforts of those who sought to, sometimes actively, but often through tactics one might characterize as passively aggressive. In this vein, it is easy to understand how for the Respondents no defense asserted and no position taken would prove be an unsuccessful one, because even outcomes and rulings adverse to the Debtor would take time to secure. The numerous deficiencies recounted above are thus significant not for any one particular shadow they cast on the Respondent's conduct, but on the light they collectively shed on their overall strategy which, simply put, was to stall Piscitelli. In hindsight, it must ruefully be conceded that the strategy succeeded.

Neither the Debtor nor counsel adequately answers this indictment. In his response, and at the hearing of October 2, 2000, the Debtor admitted responsibility for many of the shortcomings detailed herein, but blamed a good deal on bad advice and representation from Mirow. The Debtor argued that he never intended things to go the way they did. He cites poor health along with emotional and family problems as explanations for his lapses. Debtor's counsel, on the other hand, concedes almost nothing, although he does maintain that if there was any improper conduct in this case it is attributable to the Debtor and not him. Incredibly, counsel goes so far as to contend that it was he and the Debtor who throughout the case sought to move matters along, but Piscitelli who sought delay. While the best defense is sometimes said to be a good offense, this argument is so specious that is difficult to comprehend how it could even be made. In any event, the Court has considered the various arguments advanced by the Respondents and finds them lacking in credibility. The Court rejects them all as disingenuous and/or revisionist history. It bears emphasizing here that Mirow is a bankruptcy practitioner with many years experience. The Debtor himself is a practicing attorney and admits to having at least some experience representing debtors in Chapter 7 and Chapter 13 cases. This fact undercuts any contention that the requirements and obligations the pair faced in this bankruptcy case were somehow beyond their ken. Indeed, it points to the opposite, namely that while the case viewed one way might seem to have been a comedy of errors, in reality it appears to have been an invidious scheme.

In sum, the Court finds on this record clear evidence that virtually all of the Respondents' actions throughout this bankruptcy case were the product of bad faith, without color, and were made for reasons of harassment and delay. *Adams v. Carlson,* 521 F.2d 168, 170 (7th Cir.1975); *Autorama Corp. v. Stewart,* 802 F.2d 1284, 1287–88 (10th Cir.1986). As such, the Court deems it appropriate to impose joint and several monetary sanctions on both the Debtor and his counsel in an amount equal to the reasonable attorneys fees and expenses incurred by Piscitelli in connection with his representation in this bankruptcy case. *Roadway Express Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

 As to Rule 11, the Court finds that Mr. Mirow's signature on the original bankruptcy petition, as well as his signature on and advocacy of later pleadings such as the Debtor's responses to Piscitelli's motions to lift the bankruptcy stay and dismiss the bankruptcy case, violated Rule 11. The Debtor's signature on the patently false set of original bankruptcy schedules likewise violated Rule 11. These violations would independently warrant sanctions. It would be the Court's inclination to award reasonable attorneys fees and costs with respect to these Rule 11 violations however, as this sanction is already subsumed in the broader sanction described above, no separate order need or shall be entered.